Sonia Elaine BUTLER, Plaintiff,

v.

The NEW YORK HEALTH & RACQUET CLUB and Maryann Donner, Defendants.

No. 08 Civ. 591(PAC)(FM).

United States District Court, S.D. New York.

Jan. 26, 2011.

Rebecca J. Osborne, Tara Lynn Jensen, Vladeck, Waldman et al., New York, NY, for Plaintiff.

Jane B. Jacobs, Peter J. Dugan, Klein, Zelman, Rothermel LLP, New York, NY, for Defendants.

### MEMORANDUM DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

## I. *Introduction*

Plaintiff Sonia Elaine Butler ("Butler"), a former fitness instructor at the New York Health & Racquet Club ("NYHRC"), brings this action against NYHRC and Maryann Donner ("Donner"), her supervisor at NYHRC (together, the "Defendants"), alleging that they discriminated against her on the basis of her age, race, and gender, and later retaliated against her. Butler seeks relief for these alleged wrongs under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), the Equal Pay Act ("EPA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

Following the close of discovery, the Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 65). For the reasons set forth below, that motion is granted with respect to Butler's claims of race, gender, and age discrimination, but denied with respect to her equal pay and retaliation claims.

II. *Relevant Facts and Procedural History*

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Butler.

A. *Parties*

Butler is a fifty-one year old African American woman who began working for NYHRC as a group fitness instructor ("GFI") in 1998. (Pl.'s Stmt. in Opp'n to Defs.' Stmt. of Undisputed Facts Pursuant to Local Civ. R. 56.1 ("Pl.'s 56.1 Opp'n Stmt.") ¶¶ 3, 4; Defs.' Stmt. of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1 Stmt.") ¶¶ 3, 4). In 2009, Butler became fully disabled and left her employment at NYHRC. She now receives Social Security Disability benefits. (Pl.'s 56.1 Opp'n Stmt. ¶¶ 12, 75; Defs.' 56.1 Stmt. ¶¶ 12, 75).

NYHRC is a health club chain with locations in Manhattan and on Long Island. (Pl.'s 56.1 Opp'n Stmt. ¶ 1; Defs.' 56.1 Stmt. ¶ 1). During the time Butler worked there, NYHRC employed over 100 GFIs to teach fitness classes. (Pl.'s Stmt. of Disputed Facts Pursuant to Local Civ. R. 56.1 ("Pl.'s 56.1 Counter–Stmt.") ¶¶ 248–49).

Donner is NYHRC's Group Fitness Director. (Aff. of Maryann Donner, sworn to Feb. 22, 2010 ("Donner Aff."), ¶ 1). In this role, she supervises the GFIs, assigns them classes, and creates group fitness class schedules for all NYHRC locations. (Affirm. of Rebecca J. Osborne, Esq., dated Mar. 16, 2010 ("Osborne Affirm."), Ex. 3 ("Donner Dep.") at 47, 55). Donner hired Butler and was her immediate supervisor during the time she worked for NYHRC. (Pl.'s 56.1 Opp'n Stmt. ¶¶ 2, 5; Defs.' 56.1 Stmt. ¶¶ 2, 5).

B. *GFIs*

NYHRC categorizes all employees who teach group fitness classes as GFIs, without regard to whether they teach fitness classes, yoga, or a combination of classes. (Pl.'s 56.1 Opp'n Stmt. ¶ 17; Defs.' 56.1 Stmt. ¶ 17). While Butler was an NYHRC employee, GFIs were required to teach at least twelve classes per week to qualify as full-time employees entitled to employee benefits. (Pl.'s 56.1 Opp'n Stmt. ¶ 19; Defs.' 56.1 Stmt. ¶ 19). Although NYHRC expanded to several new locations during Butler's employment as a GFI, the overall number of group fitness classes offered each week actually declined. (Pl.'s 56.1 Opp'n Stmt. ¶ 29; Defs.' 56.1 Stmt. ¶ 29).

C. *Butler's Work as a GFI*

At NYHRC, Butler specialized in yoga, but occasionally taught other classes, including sculpt, stretch, and abdominal classes. (Pl.'s 56.1 Opp'n Stmt. ¶ 7; Defs.' 56.1 Stmt. ¶ 7). In 2001, Butler taught seven permanent classes and substitute taught seven other classes, as a "long-term substitute teacher." (Pl.'s 56.1 Opp'n Stmt. ¶ 9; Defs.' 56.1 Stmt. ¶ 9). After 2002, however, all of Butler's "permanent classes" (classes regularly taught on a weekly basis) were yoga classes. (Pl.'s 56.1 Opp'n Stmt. ¶ 7). She also served as a substitute teacher for at least one non-yoga class after 2002. (*Id.* ¶ 10; Defs.' 56.1 Stmt. ¶ 8).

From 2006 to 2009, Butler taught five, and later four, permanent yoga classes. (Pl.'s 56.1 Opp'n Stmt. ¶ 10; Defs.' 56.1 Stmt. ¶ 10). Butler did not wish to teach yoga exclusively and from time to time asked to be assigned additional non-yoga classes. (Pl.'s 56.1 Opp'n Stmt. ¶ 7). She also requested additional yoga classes, but, despite repeated entreaties, never was assigned enough classes to qualify as a full-time NYHRC employee. (*Id.* ¶¶ 7, 10, 19).

## D. *Butler's Compensation*

Throughout Butler's employment at NYHRC, the club paid her per class taught. She initially earned $30 per fitness class, but received four raises over the eleven years she worked at NYHRC. (*Id.* ¶¶ 5, 6; Defs.' 56.1 Stmt. ¶¶ 5, 6). By the time Butler stopped working as a GFI, she was earning $50 per class for sixty-minute classes and $55 per class for longer classes.[1] (Pl.'s 56.1 Opp'n Stmt. ¶ 14; Defs.' 56.1 Stmt. ¶ 14).

In early 2006, Butler requested that Donner increase her pay rate at NYHRC from $45 to $60 per sixty-minute class. (Pl.'s 56.1 Opp'n Stmt. ¶ 45; Defs.' 56.1 Stmt. ¶ 45; Osborne Affirm. Ex. 2 ("Butler Dep.") at 92–93). Donner countered by offering Butler a $5 increase, *i.e.,* $50 for sixty-minute classes and $55 for longer classes. (Pl.'s 56.1 Opp'n Stmt. ¶¶ 48, 51; Defs.' 56.1 Stmt. ¶¶ 48, 51). Donner contends that even this pay raise had to be approved by Jeffrey Bodnar, NYHRC's Director of Operations. (Donner Dep. at 138; Osborne Affirm. Ex. 1 ("Bodnar Dep.") at 46–47, 132–33).

There was a substantial delay in the implementation of Butler's raise. Initially, in an email sent on January 23, 2006, Donner told Butler that the pay increases would take effect on February 21, 2006. (Osborne Affirm. Ex. 17). One week later, Donner again emailed Butler, informing her that the pay increases would not go into effect until March 6, 2006. (Affirm. of Sonia Elaine Butler, dated Mar. 13, 2010 ("Butler Affirm."), Ex. 4). In June 2006, when Butler still had not received the promised raise, she emailed Donner again, asking when the increases would start. Donner responded that she was "working

on it." (*Id.* Ex. 5). According to Donner, it was her intention to process the raise "as soon as [she] could," but that it was delayed due to an inability to meet with Bodnar. (Donner Dep. at 199–200).

In June 2006, while she was awaiting a pay adjustment, Butler saw a pay rate sheet at an NYHRC site as she was signing in before teaching a class. (Pl.'s Mem. of L. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at 3–4). According to Butler, the sheet indicated that a male, non-African American GFI was being paid $70 per hour. (*Id.*). Based upon her brief review of the document, Butler concluded that most of the GFIs on the list were younger workers. (Pl.'s 56.1 Counter–Stmt. ¶ 94). Butler thus came to believe that she was being undercompensated in comparison to GFIs who were younger, male, or non-African American. (*See* Pl.'s Mem. at 4).

Butler received the promised raise for her sixty-minute classes in July 2006. Thereafter, however, she reverted to her former lower pay rate for one pay period in August 2006. (Osborne Ex. 8; Pl.'s 56.1 Opp'n Stmt. ¶ 58; Pl.'s 56.1 Counter–Stmt. ¶ 114; Defs.' 56.1 Stmt. ¶ 58). Butler suggests that this reduction constituted retaliation for the filing of her federal Equal Employment Opportunity Commission ("EEOC") complaint earlier that month. (Pl.'s 56.1 Counter–Stmt. ¶¶ 97, 114). NYHRC counters that the only reason for the reduction was that Butler missed a scheduled class during the pay period in question. (Defs.' 56.1 Stmt. ¶ 58). Whatever the cause of the reduction may have been, it is undisputed that the pay increases promised by Donner in early 2006 eventually went into effect permanently in Sep-

---

1. While she was employed by NYHRC, Butler also worked as a full-time fitness instructor at the New York Sports Club health club chain, which paid her approximately $5 more per

sixty-minute class than NYHRC did. (Pl.'s 56.1 Opp'n Stmt. ¶¶ 11, 12, 16; Defs.' 56.1 Stmt. ¶¶ 11, 12, 16).

tember 2006. (Pl.'s 56.1 Opp'n Stmt. ¶ 54; Defs.' 56.1 Stmt. ¶ 54).

### E. Butler's EEOC Charge and Defendants' Alleged Retaliation

After experiencing the delay in the processing of her raise and reviewing the pay rate sheet, Butler filed a charge of discrimination with the EEOC on August 8, 2006. In that document, as amended, Butler alleged that Donner and NYHRC had discriminated against her by paying her lower rates per class than they paid GFIs who were younger, male, or white. (See Compl. Attach.). Butler also asked that her charge be cross-filed with the applicable "State or local [a]gency." (Id.).

Butler contends that several post-filing events each constituted an act of retaliation. First, as noted previously, Butler's newly increased pay allegedly was decreased for one pay period.

Second, shortly after Butler filed her complaint, Donner characterized her as a "dangerous employee" in an email that she intended to send to Tony Perlingieri ("Perlingieri"), NYHRC's Vice President of Human Resources, but instead mistakenly sent to Butler. (Osborne Affirm. Ex. 8).

Additionally, after the complaint was filed, NYHRC's Human Resources Department gave Butler a written reprimand because she was late for a class, even though latenesses usually were not reported to Perlingieri. (Pl.'s 56.1 Counter–Stmt. ¶¶ 109–12).

Finally, in 2007, Butler asked to be placed on a list of substitute teachers for aerobics classes, but Donner failed to honor that request until June 2008, after Butler made the same request to Janet Woodfin, NYHRC's Vice President of Training and Development. (Id. ¶ 190).

### F. EEOC Determination and Subsequent Federal Suit

On October 30, 2007, the EEOC issued Butler a right to sue letter. (See Compl. Attach.). Thereafter, on or about January 30, 2008, Butler commenced this lawsuit by filing a pro se complaint.[2] (See ECF No. 1). In her complaint, Butler alleged that the Defendants violated Title VII, the ADEA, the EPA, the NYSHRL, and the NYCHRL by failing to promote her to full-time status, paying her less than white GFIs, and retaliating against her. (Compl. at 2–3). Butler contended that she was subjected to this discrimination on the basis of her race, color, gender, and age. (Id. at 3).

### G. Subsequent Procedural History

On January 23, 2009, while document discovery was underway, Rebecca J. Osborne, of Vladeck, Waldman, Elias & Engelhard, P.C., appeared on Butler's behalf. (ECF No. 23). Discovery nevertheless proceeded on the basis of Butler's original pro se complaint.

In mid-December 2009, the parties consented to my exercise of jurisdiction, pursuant to 28 U.S.C. § 636(c), for the limited purpose of deciding any summary judgment motions. (ECF No. 35). The Defendants subsequently filed their summary judgment motion on February 22, 2010. (ECF Nos. 37–41, 64–69). Butler filed her opposition papers on March 16, 2010, (ECF Nos. 43–51, 54–60), and the Defendants filed their reply papers on April 5, 2010 (ECF Nos. 70–75).[3] The motion therefore is fully submitted.

### H. Parties' Contentions

The parties disagree as to whether the pay rate sheet Butler claims to have seen

---

**2.** Butler paid the filing fee and did not proceed in forma pauperis. (ECF No. 1).

**3.** Certain of the parties' motion papers have been filed under seal.

actually existed, whether it reflected the specific hourly pay rates Butler alleges, and whether there is, in fact, any pay disparity among GFIs of different races, ages, and genders. In its motion papers, NYHRC restricted its analysis of its pay rate data to June 2006, the month Butler allegedly saw the pay rate sheet. (Defs.' Mem. of L. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 7). NYHRC claims that in June 2006, Butler's average pay per class was $47.65, slightly below the average rate for GFIs of $50.65 per class. (*Id.* at 8). After receiving her $5 per class raise, her average rate was slightly above average, at $52.65 per class. (*Id.*). The Defendants claim that in June 2006, nearly seventy percent of GFIs were paid less than $50 per class. (Defs.' 56.1 Stmt. ¶ 42). They further state that in 88 of the 121 classes in which an instructor earned more than $50, the instructors were Butler's age or older. (*Id.* ¶ 43). They also allege that in 96 of those 121 classes the instructors were female. (*Id.* ¶ 44). Butler disputes the accuracy of these assertions based on her own aggregation of the June 2006 data, which reflects discrepancies between the summary chart produced by the Defendants, (*see* Donner Aff. Ex. 1), and the actual payroll records.[4] (Pl.'s 56.1 Counter–Stmt. ¶ 277).

As part of her own statistical analysis, Butler examined the payroll records produced by the Defendants for the years 2003 through 2008. (Bellifemine Affirm. Exs. 2, 6, 9). Butler contends that these records confirm that NYHRC paid two white, male yoga instructors rates of $65, $70, and $75 per class in 2005 and 2007, even though these instructors lacked any yoga certifications. (Pl.'s 56.1 Counter–Stmt. ¶¶ 217–18). (Butler, by comparison, has certifications and formal training in yoga and other fitness disciplines. (*See* Compl. Attach.)). She also alleges that male GFIs were given more classes when they asked for them, contrary to her experience and that of other female GFIs, who were refused classes and thereby prevented from achieving full-time status. (Pl.'s 56.1 Counter–Stmt. ¶¶ 215–16).

According to Butler's calculations, 26 out of the 59 men for whom NYHRC produced pay records (*i.e.*, 44 percent), earned $55 or more per class although only 59 out of the 144 women (*i.e.*, 41 percent) earned $55 or more per class. (*Id.* ¶¶ 220–21). Additionally, Butler contends that Donner cited publicity as the alleged reason for paying two male yoga instructors higher rates, but failed to pay Butler at a similarly high rate after Butler received favorable press coverage in the *Yoga Journal*, (*Id.* ¶ 227). In response, NYHRC notes that

4. Butler also argues that any parts of the Defendants' Rule 56.1 Statement that rely on the chart the Defendants created, which summarizes the pay rates of GFIs in June 2006, should be stricken. (Pl.'s Mem. at 10). The Court declines to take such action because the "contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed.R.Evid. 1006. Although Donner's affidavit is in artfully worded, she indicates that the chart summarizes NYHRC's payroll records. (Donner Aff. ¶¶ 8–9). The Defendants were not required to produce the chart during discovery, as long as the payroll records themselves were made available to Butler. *See* Fed.R.Evid. 1006; *United States v. Earls*, No. 03 Cr. 364(NRB), 2004 WL 350725, at *9 (S.D.N.Y. Feb. 25, 2004). The records underlying the Defendants' chart obviously were produced, since they are attached to the affirmation of her counsel's paralegal, Thomas L. Bellifemine, dated Mar. 16, 2010 ("Bellifemine Affirm."), and Butler has conducted her own analysis of these same records.

Butler also contends that the Defendants' chart is rife with errors. While the chart does appear to contain certain inaccuracies, I have disregarded any that are material in the course of resolving the Defendants' motion.

Donner once offered Butler a chance to be on national television, which Butler declined. (Defs.' Reply Mem. of L. in Supp. of Mot. for Summ. J. ("Reply") at 13; Reply Aff. of Maryann Donner, sworn to Apr. 5, 2010 ("Donner Reply Aff."), ¶ 12 & Exs. I, J).

Butler also alleges that Donner treated non-African American GFIs differently than African American GFIs. In particular, she notes that Donner once "expressed surprise" after Butler's white students "supported" her in a dispute with another instructor. (Pl.'s 56.1 Counter–Stmt. ¶ 228). According to Butler, Donner also was "surprised" when she learned that Butler taught yoga at NBC's studios. (Id. ¶ 229). Butler attributes this reaction to Donner's disbelief that an African American would be hired for such a position. (Id.). Butler also contends that African American GFIs were less likely to be given additional classes when they asked for them than non-African American GFIs, and that Donner assigned fewer classes to African American GFIs. (Id. ¶¶ 231–32). Butler further maintains that Donner either took classes away from, failed to give additional classes to, or fired Butler and eight other African American GFIs. She alleges that, by comparison, Donner allowed a white GFI to continue to teach (subject to remediation) after club members complained about that GFI's class, and allowed another white GFI to keep her class despite its low attendance rates. (Id. ¶¶ 238–47).

Butler extrapolates from the payroll records that seven non-African American GFIs were at times paid rates per class higher than the rates at which Butler was compensated. (Id. ¶¶ 233–37). Additionally, Butler notes that NYHRC's payroll records list pay rates for six African American GFIs. (Id. ¶¶ 248). Only two of those six African American GFIs ever were paid $60 or more per class. (Id. ¶ 249). During the same period, however, 35 of 101 non-African American GFIs earned $60 or more per class. (Id. ¶¶ 248–49).[5]

Butler contends that Donner also favored younger teachers. In support of this claim, she notes that Donner once made an apparently ageist comment to another older instructor, Jill Weinstein, who then complained to Woodfin about the remarks. (Pl.'s 56.1 Counter–Stmt. ¶ 212; Osborne Affirm. Ex. 6 ("Woodfin Dep.") at 146–48). She further observes that Consuela Moravkova, the oldest yoga instructor, whom NYHRC considers the "cornerstone" of its yoga program, never has taught enough classes to become a full-time GFI. (Pl.'s Mem. at 8). The Defendants do not dispute that Moravkova works part time, but maintain that she never has asked to become a full-time employee.[6] (Reply at 13).

In their reply papers, the Defendants assert that it is "neither practical nor necessary to respond to each allegation in detail." (Id. at 12). As a consequence, they do not rebut Butler's calculations concerning the number of GFIs paid at rates higher than $55 per class. They nevertheless contend that Butler's claims of discriminatory animus are based on nothing more than Butler's "unsupported opinion." (Id. at 13).

5. Butler contends that there are an additional eight African American GFIs for whom pay rates were never disclosed. (Pl.'s 56.1 Counter–Stmt. ¶¶ 238–39, 242–47; Bellifemine Affirm. Ex. 2).

6. Ironically, at the time that Butler last requested a pay raise, Moravkova was receiving the highest per-class pay among the yoga instructors at NYHRC. (See Donner Dep. at 183).

The Defendants further contend that pay rates for GFIs differ based on the types of classes taught, as well as their duration, time slots, and popularity (measured by class attendance), among "other factors." (Defs.' 56.1 Stmt. ¶ 33). Butler counters that Donner has complete discretion over pay rates, that there is no formula for applying the factors cited by the Defendants, and that they are applied inconsistently among GFIs. (Pl.'s 56.1 Opp'n Stmt. 133).

## III. *Discussion*

### A. *Applicable Law*

#### 1. *Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record. Fed.R.Civ.P. 56.

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir.2002); *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *See Beyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir.2008). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. *Fischl*, 128 F.3d at 55; *see also* Fed.R.Civ.P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl*, 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### 2. *Title VII and the ADEA*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Under the ADEA, it is unlawful for "an employer ... to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

To overcome a motion for summary judgment with respect to claims under these statutes, "a discrimination plaintiff must withstand the three-part burden-shifting laid out by *McDonnell Douglas Corp. v. Green*," 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir.2006) (ADEA); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir.2005) (Title VII). Under that rubric, the plaintiff must satisfy an initial burden of "proving by the prepon-

derance of the evidence a *prima facie* case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case, an employee must show that: (a) he was within the protected class; (b) his job performance was satisfactory; (c) he was subjected to an adverse employment decision or discharge; and (d) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006); *Stratton v. Dep't For the Aging,* 132 F.3d 869, 879 (2d Cir.1997).

■ "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks omitted). "To be materially adverse[,] a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation marks omitted). Among the actions that qualify as materially adverse are "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id.* As the Second Circuit emphasized in *Galabya,* however, "other indices . . . unique to a particular situation" also could be considered materially adverse. *Id.*

■ Once the plaintiff makes out a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Sharpe v. MCI Commc'ns Servs., Inc.,* 684 F.Supp.2d 394, 401 (S.D.N.Y.2010) (quoting *Stratton,* 132 F.3d at 879). The purpose of this step is "to force the defendant to give an explana-tion for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Felder v. Securitcus Sec. Serv.,* No. 04 Civ. 9501(LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006) (quoting *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1335 (2d Cir.1997) (*en banc* )).

■ Finally, if the defendant provides a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual, but also that the defendant discriminated against the plaintiff. *Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 93–94 (2d Cir.2001). In other words, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000). Under Title VII, discrimination need not be the sole reason, so long as it is a reason for the adverse employment action; under the ADEA, however, a plaintiff must show that the action would not have occurred "but for" the plaintiff's age. *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 106–07 (2d Cir.2010) (ADEA); *Holcomb v. Iona Coll.,* 521 F.3d 130, 142 (2d Cir.2008) (Title VII).

### 3. *EPA*

■ "To prove discrimination under the [EPA], a plaintiff must show that: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.' " *Lavin–McEleney v.*

*Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999)); *see also* 29 U.S.C. § 206(d)(1). "With regard to the second point, '[a] plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are substantially equal' in skill, effort, and responsibility." *Lavin–McEleney*, 239 F.3d at 480 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir.1995)).

■ Once a plaintiff has made a *prima facie* showing, the burden shifts to the employer to prove that the pay differential is based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (structure and history of EPA suggest that "once the [plaintiff] has carried his burden . . ., the burden shifts to the employer to show that the differential is justified under one of the [EPA's] four exceptions").

■ Importantly, to prove a claim under the EPA, a plaintiff need not prove that the defendant intentionally discriminated against her; it is sufficient that some pay differential exists. *See Lavin–McEleney*, 239 F.3d at 483 (noting that "a Title VII disparate treatment claim requires a showing of discriminatory intent, while an Equal Pay Act claim does not").

### 4. *Retaliation Claim*

■ Both Title VII and the ADEA make it unlawful for an employer to retaliate against an employee who has exercised her statutory right to complain about conduct that she considers discriminatory. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e–3(a). A retaliation claim is "not dependent on the merits of the underlying discrimination complaint." *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir.1986). Thus, to establish a *prima facie* case of retaliation, an employee need only show that: (a) the employee engaged in a protected activity; (b) the employer knew of this activity; (c) the employer took adverse action against the employee; and (d) there was a causal relation between the adverse action and the employee's protected activity. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir.1996). The filing of a complaint with an anti-discrimination agency is such a protected activity. 42 U.S.C. § 2000e–3(a); *see Terry v. Ashcroft*, 336 F.3d 128, 140–42 (2d Cir.2003).

■ Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a *prima facie* case. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932–33 (2d Cir.2010); *Simpson v. N.Y. State Dep't of Civil Serv.*, 166 Fed.Appx. 499, 502 (2d Cir.2006). However, temporal proximity, without more, "is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *Id.*

### 5. *State and City Law Claims*

■ The NYSHRL and NYCHRL prohibit an employer from discriminating against an employee in the terms, conditions, or privileges of employment on the basis of age, gender, or race. *See* N.Y. Exec. Law § 296(1)(a); N.Y. City Admin. Code § 8–107(1)(a). The framework for analyzing NYSHRL and NYCHRL discrimination claims is essentially the same as under Title VII and the ADEA. *See, e.g., Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir.2010) ("[A] plaintiff's discrimination claims under both the NYSHRL and the

NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII."); *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n. 1 (2d Cir.2009) (applying Title VII analysis to state and municipal claims in New York); *Sowemimo v. D.A.O.R. Sec. Inc.*, 43 F.Supp.2d 477, 484 (S.D.N.Y.1999) (noting that claims under Title VII, NYSHRL, and NYCHRL "can be examined identically for summary judgment purposes"); *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F.Supp. 298, 300 (S.D.N.Y.1996) (stating that NYSHRL "is applied in a fashion consistent with the federal civil rights laws").[7]

■ Like the federal anti-discrimination statutes, both the NYSHRL and the NYCHRL also prohibit retaliation. N.Y. Exec. Law § 296(7); N.Y. City Admin. Code § 8–107(7).

### B. *Application of Law to Facts*

#### 1. *EPA*

In support of her EPA claim, Butler alleges that one male GFI "was paid $75 for *classes* in 2005" and that another male GFI "was paid $70 for *classes* in 2007." (Pl.'s 56.1 Counter–Stmt. ¶ 181 (emphasis added)). Both assertions are inaccurate. In fact, GFI William Dalton was paid $75 for only *one* class on October 16, 2005, and $65 or less for the remaining classes he taught. (Bellifemine Affirm. Ex. 2 at 501). GFI Matthew Miller similarly was paid

$70 for only *one* class on June 22, 2007; for the fourteen other classes he taught, he was paid $55 per class, or less. (*Id.* at 552–A).

■ As the Second Circuit has recognized, "the problem with comparing [a] plaintiff's pay only to that of a single male employee is that it may create the impression of an [EPA] violation where no widespread gender discrimination exists." *Lavin–McEleney*, 239 F.3d at 481. For this reason, in *Lavin–McEleney*, the Second Circuit cited approvingly a Ninth Circuit decision holding that

> the proper test for establishing a prima facie case in a professional setting such as that of a college is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale.

*Id.* at 482 (quoting *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir.1983)). Although a health club may not constitute a "professional" venue, the notion that one or two isolated examples of disparate pay are not enough to make out an EPA violation is equally applicable here. Thus, Butler's attempt to cherry pick two payments from a list of thousands of payments to GFIs is not sufficient to make out a *prima facie* case under the EPA.[8]

---

**7.** The New York City Council has enacted legislation requiring that claims under the NYCHRL be reviewed more liberally than claims under its state and federal counterparts. "The New York City Restoration Act, which amended the NYCHRL, 'notified courts that (a) they had to be aware that some provisions of the [NYCHRL] were textually distinct from its state and federal counterparts, [and] (b) all provisions of the [NYCHRL] required independent construction to accomplish the law's uniquely broad purposes.'" *Fowler v. Scores Holding Co.*, 677 F.Supp.2d 673, 682 (S.D.N.Y.2009) (quoting *Loeffler v. Staten Is-*

*land Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)) (emphasis in original); *see also Panzarino v. Deloitte & Touche LLP*, No. 05 Civ. 8502(BSJ)(RLE), 2009 WL 3539685, at *9–10 (S.D.N.Y. Oct. 29, 2009) (construing plaintiff's NYCHRL sex discrimination claim as requiring an independent and liberal construction).

**8.** Butler also attempts to support her EPA claim by asserting that "although women account for roughly two-thirds of [NY]HRC's yoga GFI[s], close to half of the GFI[s] who make $55 or more are men." (Pl.'s Mem. at 13 (citing Pl.'s 56.1 Counter–Stmt. ¶¶ 220–

■ More telling is Butler's allegation that, based on an analysis of NYHRC's records, thirteen men were paid more than $58 per class, which is a pay rate in excess of Butler's highest rate. (Pl.'s 56.1 Counter–Stmt. ¶ 223). This, combined with Butler's own lower pay rate, is sufficient to establish—albeit, barely—a *prima facie* EPA case.[9]

■ The Defendants argue that, even if Butler can make out a *prima facie* case under the EPA, they have adequately justified the higher rates paid to the male GFIs. They have, however, failed to cite any *undisputed* facts which would justify the alleged disparate pay treatment upon which Butler relies.

At the outset, the Defendants incorrectly assume that Butler's claim of pay discrimination is based solely on the pay rate sheet she saw in June 2006. (Defs.' Mem. at 16–17). Based on this myopic view, they contend, first, that the particular GFI Butler claims was listed on that sheet as receiving a higher rate actually was paid less than Butler during that month, and, second, that Butler's claim fails because her earnings per class during that month were approximately the same as the average rate per class for NYHRC GFIs at the time. (*Id.*). The Defendants further assert (without citation to any supporting documents) that Butler's "class counts were anemic," that "she was not a star," and that "[h]er mid-range pay scale comported with her mid-range performance." (*Id.* at 17).

By limiting their focus to Butler's wages during June 2006, the Defendants have failed to address the other pay disparities that she has identified. For example, they have not cited any specific differences which would explain why Butler was paid less than the thirteen male GFIs. Instead, the Defendants simply rely on a set of amorphous factors allegedly used to determine GFI pay rates, "including the length of the class, the kind of class, popularity of the class, the instructor's enthusiasm and attitude, member comments, and similar factors." (*Id.*). Although such factors could potentially rebut a *prima facie* showing of an EPA violation, the Defendants have utterly failed to explain, except in the most conclusory terms, how these criteria were applied in a non-discriminatory way to differentiate Butler from the male GFIs who earned more than she did. Summary judgment on Butler's EPA claim therefore must be denied.

### 2. *Title VII*

It is undisputed that Butler is both African American and a woman and, therefore, a member of two classes protected under Title VII. (Compl. at 3); *see* 42 U.S.C. § 2000e–2(a). The Defendants further concede that she was "qualified to be a yoga instructor." (Defs.' Mem. at 18). The remaining issues with respect to Butler's Title VII claims thus are whether she can show (a) that she suffered an adverse employment action, and (b) that the surrounding circumstances give rise to an in-

---

21)). However, Butler's calculation is mistaken. She identifies 26 male and 59 female GFIs who earned $55 or more. (Pl.'s 56.1 Counter–Stmt. ¶ 221). Thus, a total of 85 GFIs earned $55 or more and approximately 31 percent of those GFIs are male. It appears that the percentage of male GFIs earning $55 or more consequently is roughly proportionate to their representation among all of NYHRC's yoga GFIs (*i.e.,* one-third).

9. NYHRC claims that Butler has inflated her statistics by including payments to men that were aberrational. (*See* Reply at 4 & n. 6). For example, NYHRC notes that GFI John O'Brien earned more than $60 only once in more than 600 classes taught. (*Id.*). The significance of Butler's numbers also is attenuated by her concession that 27 female GFIs earned more than she did per class. (Pl.'s 56.1 Counter–Stmt. ¶ 223).

ference that the adverse employment action arose out of discrimination on the basis of her race or gender. *See Demoret,* 451 F.3d at 151.

### a. *Race Discrimination*

■ Butler contends that she was subjected to racial discrimination in several different ways. For example, she alleges that she was paid less than non-African American GFIs. (Compl. at 2). NYHRC's payroll records confirm that she was paid less than at least seven non-African American GFIs. (Pl.'s 56.1 Counter–Stmt. ¶¶ 233–37). Subjecting an employee to unequal pay can, of course, constitute a materially adverse employment action. *See Borrero v. Am. Express Bank Ltd.,* 533 F.Supp.2d 429, 438 (S.D.N.Y.2008). Butler therefore has met her burden of adducing facts which suggest that she was subjected to a race-based adverse employment action.

■ Butler also claims that she was subjected to a race-based adverse employment action by being denied the opportunity to teach additional classes and thus to qualify as a full-time employee. (*See* Butler Affirm. 19) ("African–American instructors were less likely to be given additional classes to teach when they asked."). There is no need to consider this additional claim in detail, however, because even if Butler were able to establish additional adverse employment actions, the circumstances surrounding her employment at NYHRC simply do not give rise to an inference that she was subjected to racial discrimination.

In an effort to prove the contrary, Butler cites several examples of Donner's alleged racial bias. However, Butler's claims with respect to Donner's alleged behavior and attitudes regarding African Americans are, without exception, purely speculative. Indeed, she has not identified a single statement that Donner made that can reasonably be considered disparaging toward African Americans or an indication of racial bias.

For example, in her papers, Butler suggests that when her white students supported her in a dispute with another instructor, Donner's reaction "indicated" that she was surprised by the white students' showing of support. (Pl.'s 56.1 Counter–Stmt. ¶ 228). Butler similarly states that Donner stared at her in "a strange manner" when she wore her hair in an Afro, suggesting that this evidences a racial bias. (*Id.* ¶ 230). Such conclusory assertions, however, are insufficient to demonstrate that Donner treated Butler as she did because of racial animus. *See Hurd v. N.Y. City Health & Hosps. Corp.,* No. 07 Civ. 1250, 2008 WL 5120624, at *1 (2d Cir. Dec. 8, 2008) (plaintiff's reliance "on conclusory statements regarding one supervisor's favoritism towards Hispanics" was insufficient to establish inference of discrimination).

Moreover, although the parties agree that Butler asked to teach more classes than Donner assigned to her, Butler has not pointed to anything other than speculation that suggests Donner granted fewer requests for more classes made by African American GFIs than by white GFIs. Indeed, Butler has not provided so much as a single affidavit from an African American GFI other than herself who requested, but was denied, additional classes or full-time status.

Finally, even Butler's statistics do not support her assertion that African American GFIs were paid less, on average, than non-African American GFIs. It is true, as she alleges, that of the six African American GFIs for whom payroll records exist, only two (or 33.33 percent), ever earned $60 or more per class. (Pl.'s 56.1 Counter–Stmt. ¶ 249). However, of the non-

African Americans included in the payroll records, only 35 of 101 GFIs (or approximately 34.7 percent) ever earned $60 or more per class. (*Id.* ¶¶ 248–49). There consequently does not appear to be any statistically significant difference between the proportion of African American and non-African American GFIs who were compensated at the higher end of the pay spectrum. Moreover, although the absolute total number of African American GFIs obviously is smaller than that of non-African American GFIs, Butler has not shown that it is disproportionate to the number of African American applicants for GFI positions.

Accordingly, because Butler has not shown that any adverse employment action that she allegedly suffered occurred under circumstances suggesting a racially-discriminatory motivation, Butler has failed to make out a *prima facie* case of racial discrimination in violation of Title VII.[10] The Defendants consequently are entitled to summary judgment on this claim.

### b. *Gender Discrimination*

 Turning to gender discrimination, Butler contends that the Defendants discriminated against her by paying her less than male GFIs. Butler's *prima facie* showing of an EPA violation also establishes, as a matter of law, a *prima facie* case of gender-based pay discrimination in violation of Title VII. *See* 29 C.F.R. § 1620.27(a) ("In situations where the jurisdictional prerequisites of both the EPA and Title VII of the Civil Rights Act of

1964 ... are satisfied, any violation of the Equal Pay Act is also a violation of Title VII."). The next step of the *McDonnell Douglas* analysis therefore requires the Court to consider whether the Defendants have adequately rebutted that *prima facie* case.

 Citing the pay rates of GFIs Dalton and Miller, among others, the Defendants complain that Butler has cherry picked NYHRC's pay records by "counting anomalies as if they represented regular rates." (Reply at 4). The Defendants also note that during June 2006, the sole month they examined, 96 of the 121 instructors who earned more than Butler (*i.e.*, 79 percent) were female. (Defs.' 56.1 Stmt. ¶ 44). Finally, they suggest that any pay disparity to which Butler allegedly was subjected was based on such criteria as the size of her classes, her degree of enthusiasm, and her attitude. (Defs.' Mem. at 17). The last element of this proffer is alone sufficient to meet the Defendants' minimal burden of production at the second step of the *McDonnell Douglas* analysis.

The burden thus is on Butler to show that the Defendants' stated reasons for Butler's pay are pretextual and that she was paid less than others, at least in part, because of her gender. Butler utterly fails to explain, however, why an inference of gender-based pay discrimination is warranted when the vast majority of GFIs who were paid more than her apparently were women.[11] Indeed, Butler's statistical

---

**10.** It also is noteworthy that Donner hired Butler and presumably played a role in each of the four raises she received during her tenure at NYHRC. (Pl.'s 56.1 Opp'n Stmt. ¶¶ 5, 6; Defs.' 56.1 Stmt. ¶¶ 5, 6). As the Second Circuit has recognized, although these actions are not dispositive, they certainly serve to undermine Butler's claim of racial discrimination. *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000) ("[W]here the

person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.") (citing *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997)).

**11.** According to Butler's own analysis, there were 13 male and 27 female instructors who

analysis shows that the percentage of male and female GFIs in each pay rate category does not differ substantially from their overall representation at NYHRC. (*See* Pl.'s 56.1 Counter–Stmt. ¶¶ 220–23). For example, while one-third of all yoga GFIs were male, men constituted between 27 and 33 percent of the GFIs in each pay rate category. (*Id.;* Pl.'s Mem. at 13). It therefore cannot be said that a disproportionate percentage of male GFIs were compensated at the higher end of the pay scale at NYHRC.

■ In these circumstances, there simply is no evidence that the pay disparity that Butler alleges is attributable to gender bias. Since a Title VII unequal pay claim, unlike an EPA claim, requires a showing of intentional discrimination, *see Lavin–McEleney,* 239 F.3d at 483, the Defendants are entitled to summary judgment with respect to Butler's gender bias claim.

### 3. *ADEA*

■ Butler has not furnished the Court with any statistical data suggesting that the Defendants have discriminated against her (or any other GFIs) on the basis of age. Instead, she bases her ADEA claim entirely on three isolated circumstances.

First, Butler notes that over the past few years, Debra Blum, a GFI who is younger than Butler, began to receive full-time benefits, while Moravkova, a GFI who is 65 years old, did not. (Pl.'s Mem. at 8; Pl.'s 56.1 Counter–Stmt. ¶ 206). Utterly lacking from this scenario, however, is any suggestion that Moravkova ever sought a full-time class load. Indeed, Moravkova has submitted an affidavit in support of the Defendants' motion which states that she is "satisfied with [her] class schedule"

earned $58 or more per class. (Pl.'s 56.1

and with Donner's treatment of her over the years. (Aff. of Consuela Moravkova, sworn to Apr. 5, 2010, ¶ 6). Moravkova adds that over the course of the fifteen years that she has reported to Donner, she has "never seen or known ... Donner to engage in any acts of employment discrimination based on age, gender, or race." (*Id.* ¶¶ 3–4). Moravkova's circumstances therefore do not permit any inference that the Defendants discriminated against Butler based on her age. The fact that one younger GFI was made a full-time employee also does not give rise to such an inference.

Second, Butler alleges that Donner was trying to replace older GFIs with younger GFIs. Butler bases this accusation on a conversation that she had "[s]ometime after 2003" with another GFI who expressed that belief to her. (*See* Butler Dep. at 229–30). To oppose summary judgment, however, a party must rely on admissible evidence. *Spiegel,* 604 F.3d at 81. Butler's alleged conversation with the other GFI is inadmissible both because it is hearsay and because it expresses a conclusion without any evidentiary foundation. *See, e.g., Smith v. Am. Express Co.,* 853 F.2d 151, 155 (2d Cir.1988) (plaintiff failed to show that employer's reason was pretextual when his allegations were "unsupported by any admissible evidence and ... based on information and belief, rather than personal knowledge"); *Weltz v. City of N.Y.,* No. 99 Civ. 3932(RCC), 2004 WL 1907309, at *5 (S.D.N.Y. Aug. 25, 2004) (unsworn doctor's letters cannot support opposition to motion for summary judgment because they are inadmissible hearsay).

Finally, Butler relies on a comment that Donner made to Jill Weinstein, another older GFI, during the course of a meeting

Counter–Stmt. ¶ 223).

with Weinstein and Janet Woodfin, NYHRC's Vice President of Training and Development. That comment, to which Weinstein evidently took offense, suggested that everyone in Brazil is young and attractive. (Woodfin Dep. at 146–48). Even if the Court were to assume that Donner favored Brazilians based on their alleged youth and beauty, there has been no showing that Donner turned down Butler's requests for more classes and a larger pay raise because she chose to confer these benefits instead on younger GFIs of Brazilian heritage. In the absence of such evidence, Butler is asking the Court to infer from a single isolated remark concerning Brazilians that Donner discriminated *against Butler* based on her age. This would require a finder of fact to engage in wholesale—and wholly impermissible—speculation.

For these reasons, the Defendants are entitled to summary judgment with respect to Butler's ADEA claim.

### 4. *Retaliation Claim*

■ It is undisputed that Butler filed a complaint with the EEOC that NYHRC knew about by August 23, 2006. (*See* Compl. Attach.; Osborne Affirm. Ex. 7 at 3). It further is undisputed that during NYHRC's second pay period in August 2006, Butler's pay, which recently had been increased, was temporarily lowered. (*See* Pl.'s 56.1 Opp'n Stmt. ¶¶ 58–59; Defs.' 56.1 Stmt. ¶¶ 58–59). The Defendants contend that this was a result of Butler's failure to teach a scheduled class. (*Id.* ¶ 58; Reply at 14–15). Butler maintains, to the contrary, that she did not miss any class during the relevant time period. (Butler Dep. at 112–13). In the absence of any documentary evidence showing that someone substitute taught for Butler, the Defendants cannot establish, as a matter of law, that the temporary decline in Butler's weekly pay was attributable to her having failed to teach a scheduled class. Consequently, because the causal relation between the pay decrease and Butler's EEOC claim is disputed, the Court is unable to hold, as a matter of law, that the drop in Butler's pay was not retaliatory.

Although the Defendants also maintain that Butler's temporary decrease in pay does not rise to the level of a *materially* adverse employment action, within a matter of weeks after Butler's EEOC charge was filed, NYHRC served her with its first written reprimand. (*See* Pl.'s 56.1 Counter–Stmt. ¶¶ 108–13). Moreover, that reprimand related to lateness, a problem that Butler contends was not usually addressed in the form of a writing from NYHRC's Human Resources Department. (*See id.* ¶ 109).

While Butler supports her claim by relying primarily on the temporal proximity between filing her EEOC complaint and these alleged acts of retaliation, (*see* Pl.'s Mem. at 23), she also has offered circumstantial evidence to establish an inference of retaliatory animus. For example, after NYHRC became aware of Butler's EEOC filing, Donner described Butler as "one dangerous employee." (Osborne Aff. Ex. 8). Around the same time, Perlingieri similarly told Donner to "be careful with [Butler] and trust nothing at this point." (*Id.* Ex. 44).

These statements raise a triable issue of material fact as to whether NYHRC's proffered explanations for the drop in Butler's pay and the decision to reprimand her were pretextual. Indeed, a reasonable finder of fact considering all of the evidence could conclude that NYHRC had embarked on a campaign of petty harassment intended to dissuade Butler from pursuing her EEOC claims. Summary judgment therefore must be denied with respect to Butler's retaliation claim. *See Hicks v. Baines,* 593 F.3d 159, 165 (2d

Cir.2010) ("Actions are materially adverse if they ... 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

### 5. *State and City Law Claims*

■ The Defendants' last contention is that Butler's NYSHRL and NYCHRL claims are barred by the applicable three-year statute of limitations because there is "no evidence" that her EEOC claim actually was cross-filed with the required state and city agencies, which they allege is a prerequisite to the tolling of the statute while the EEOC claim was pending. (Defs.' Mem. at 23–24) (citing NYSHRL § 290, *et seq.*; NYCHRL § 8–108, *et seq.*).[12] In the alternative, the Defendants argue that if there were timely state and local agency filings, there has been no showing that those agencies dismissed Butler's cross-filed charges and, hence, no showing that she has exhausted her administrative remedies. (*Id.* at 24), Since the statute of limitations is an affirmative defense, the Defendants bear the burden of proof as to these issues. *Constance v. Pepsi Bottling Co. of N.Y.*, No. 03 Civ. 5009(CBA) (MDG), 2007 WL 2460688, at *13 (E.D.N.Y. Aug. 24, 2007).

■ Butler's initial charge of discrimination clearly states that she wished to have her "charge filed with both the EEOC and the State or local [a]gency." (*See* Compl. Attach.). In 2006, when she filed that charge, the EEOC and the New York State Division of Human Rights ("Division") were parties to a work-sharing agreement pursuant to which all EEOC claims were deemed cross-filed with the Division. (*See* Osborne Affirm. Ex. 73

¶ II.A.). Butler's filing with the EEOC consequently constituted a timely simultaneous filing with the Division. Butler need not show that she subsequently exhausted that claim because the NYSHRL "contains no requirement of exhaustion of administrative remedies." *Branker v. Pfizer, Inc.*, 981 F.Supp. 862, 865 (S.D.N.Y.1997).

Turning to the NYCHRL claim, although Butler's EEOC charge asked that her claim be filed with the "State or local [a]gency," there has been no showing that she, in fact, filed a charge with the New York City Human Rights Commission. Here again, however, there is no requirement that Butler pursue an administrative remedy before bringing suit on her NYCHRL claim in federal court. *See id.*

■ Moreover, even if the Defendants were able to show that Butler failed to file her discrimination claim with any agency other than the EEOC, "numerous courts in this Circuit have held that the three-year statute of limitations applicable to claims under [the] NYSHRL and [the] NYCHRL 'is tolled during the period in which a complaint is filed ... with the EEOC.'" *Esposito v. Deutsche Bank AG*, 07 Civ. 6722(RJS), 2008 WL 5233590, at *5 (S.D.N.Y. Dec. 16, 2008) (quoting *Lee v. Overseas Shipholding Grp., Inc.*, No. 00 Civ. 9682(DLC), 2001 WL 849747, at *8 (S.D.N.Y. July 30, 2001)). Here, there is no question that the EEOC claim was timely filed. The Defendants consequently cannot meet their burden with respect to their statute of limitations affirmative defense.

### C. *Spoliation*

■ In her opposition papers, Butler seeks to have an adverse inference charge

---

**12.** The statute of limitations is three years for claims brought under both the NYSHRL and the NYCHRL. N.Y. C.P.L.R. § 214(2); N.Y. City Admin. Code § 8–502(d).

given to the jury because NYHRC allegedly failed to preserve or produce the pay rate sheet that she saw in June 2006 and Perlingieri's notes of his internal investigation of Butler's claims. (*See* Pl.'s Mem. at 11–12 (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108, 113 (2d Cir.2002); *Shaffer v. RWP Grp., Inc.*, 169 F.R.D. 19, 25–27 (E.D.N.Y.1996))). At the summary judgment stage, the Court's role is to determine whether factual issues exist, not to decide whose rendition of disputed facts is more credible. Here, however, NYHRC has denied the existence of any pay rate sheet and has proffered an explanation for the missing notes. (*See* Reply at 7–8). Accordingly, Butler's request for an adverse inference is premature. The parties have consented to my jurisdiction only for the purpose of deciding this motion. Any requests with respect to proposed jury instructions should therefore be directed to Judge Crotty, before whom the case presumably will be tried.

IV. *Conclusion*

For the reasons set forth above, the Defendants' motion for summary judgment, (ECF No. 65), is granted with respect to Butler's age, gender, and race discrimination claims under Title VII, the ADEA, the NYSHRL, and the NYCHRL. The Defendants' motion is denied with respect to Butler's gender discrimination claim under the EPA and her Title VII and NYSHRL retaliation claims.

The Court will hold a telephone conference on February 4, 2011, at 9:30 a.m., to discuss the next steps in this case. Ms. Osborne should initiate that call.

SO ORDERED.